**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SALAH ELGAMMAL**<br>**2317 Crescent Moon Street**<br>**Kissimmee, FL 34746**<br><br><br>*Plaintiff,*<br><br>v.<br><br>**MARKWAYNE MULLIN, IN HIS**<br>**OFFICIAL CAPACITY AS**<br>**SECRETARY OF THE U.S.**<br>**DEPARTMENT OF HOMELAND**<br>**SECURITY**<br>**St. Elizabeths West Campus**<br>**245 Murray Lane S.W.**<br>**Washington, DC 20528**<br><br><br>*Defendant.* | **Case No.**<br>**Jury Trial Demand** |

## COMPLAINT

Salah Elgammal ("Plaintiff" or "Mr. Elgammal"), by and through counsel, files this Complaint against Defendant Markwayne Mullin, in his official capacity as Secretary of the United States Department of Homeland Security, and states as follows: Plaintiff seeks relief pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq., including 42 U.S.C. §§ 2000e-16(a) and 2000e-16(c), for Defendant's unlawful discrimination based on race, color, religion, and national origin, retaliation, hostile work environment, and wrongful demobilization from his FEMA assignment.

## PARTIES

1.     Mr. Elgammal is an adult individual and a resident of Florida.

2.     Defendant Markwayne Mullin is the Secretary of the United States Department of Homeland Security and is sued in his official capacity.

1

3.    At all relevant times, Plaintiff worked as a Senior Structural Engineer contracted to perform work in connection with FEMA disaster assistance in Puerto Rico designated as DR-4473.

4.    At all relevant times, Plaintiff worked as a contractor for Flux Resources, a subcontractor under primary contractor CCPRS, and was contracted to the United States Department of Homeland Security's Federal Emergency Management Agency.

5.    At all relevant times, Plaintiff was entitled to protection under Title VII of the Civil Rights Act of 1964, as amended, including 42 U.S.C. § 2000e-16.

6.    At all relevant times, Defendant was subject to Title VII's federal-sector anti-discrimination and anti-retaliation provisions.

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq., including 42 U.S.C. §§ 2000e-16(a) and 2000e-16(c). Plaintiff brings this civil action against the head of the department, agency, or unit as required by 42 U.S.C. § 2000e-16(c).

8.    Venue is proper in this District pursuant to 42 U.S.C. § 2000e-5(f)(3) and 42 U.S.C. § 2000e-16(d) because the claims involve the United States Department of Homeland Security and the Federal Emergency Management Agency, the administrative investigation was conducted in Washington, D.C., and Defendant maintains official offices in this District. Plaintiff exhausted his administrative remedies through the federal-sector EEO process before filing this action.

## FACTS

9.    Mr. Elgammal is Egyptian/Arab, Black, Muslim, and of Egyptian/Arab national origin. Plaintiff worked as a Senior Structural Engineer in connection with FEMA disaster assistance work

in Puerto Rico designated as DR-4473. Plaintiff was employed as a contractor with Flux Resources and was assigned to perform FEMA-related disaster assistance work through CCPRS. FEMA awarded a Public Assistance Technical Assistance contract to CCPRS for disaster assistance work in Puerto Rico. Flux Resources was one of several firms providing professional staffing to serve FEMA's mission through CCPRS.

10.     Plaintiff was employed as a contractor with FEMA from August 18, 2020 through April 21, 2021. Plaintiff performed work at DR-4473-PR, FEMA Branch 4 Puerto Rico, 2040 Av Rafael Cordero Santiago, Ponce, Puerto Rico. Plaintiff was hired while living in Chicago, Illinois. He was deployed to Puerto Rico to perform work as a FEMA TAC Site Inspector and Senior Structural Engineer and was assigned to work on FEMA Public Assistance projects related to earthquake disaster recovery work in Puerto Rico.

11.     During Plaintiff's deployment, CCPRS managed logistics for subcontracted professionals and served as human resources during deployment. CCPRS handled accommodations during Plaintiff's deployment, including housing, rental cars, and management of timesheets. CCPRS oversaw approval of overtime for Plaintiff. Although Plaintiff's timesheets were processed through CCPRS, paychecks were issued through Plaintiff's individual employer firm, Flux Resources. CCPRS also managed health and safety for subcontracted personnel.

12.     FEMA employees facilitated completion of the work in furtherance of FEMA's overall mission. FEMA provided equipment for contractors to complete their assignments and FEMA employees distributed assignments directly to contract employees through Site Inspection Work Orders communicated through the Grants Manager Portal. FEMA assigned primary and alternate site inspectors to each project. FEMA employees served as points of contact for issues concerning

work orders. The work orders identified inspection locations, structures to be inspected, descriptions of damage, and estimated completion time.

13.    FEMA required contractors to collect information necessary for processing inspections. Plaintiff was a member of a site inspection Pilot Program. Under the Pilot Program, inspection team members processed the site inspection phase, while FEMA staff processed the Grants Manager documentation phase. The FEMA Grants Manager Portal was the platform where requests for Public Assistance were processed. A Work Order was issued for each site or a group of buildings, with subsequent Damage Inventory numbers. A work order may contain one Damage Inventory or multiple Damage Inventories, depending on the number of buildings or sites involved according to PDMG and the applicant categorization.

14.    The FEMA Task Force Leader assigned a work order to a Primary Inspector and inspection team of his choice. The role of the Primary Inspector was to coordinate the inspection process with the applicant Point of Contact, prepare the inspection forms, and distribute the work between inspection team members. A work order had two main phases to process: the site inspection phase and the Grants Manager documentation phase. During the site inspection phase, the goal was to identify, record, and document damages in the facility due to seismic forces. To document damages, a handwritten Site Inspection Report was filled out, and photos of identified damages were taken. Following the inspection, the Site Inspection Report was reviewed and finalized, sketches were developed, and photos were renamed and organized.

15.    During the Grants Manager documentation phase, maps were developed, Damage Dimensions and Description data entry was processed, and documents were uploaded to Grants Manager. After upload to Grants Manager, extensive review was conducted and the Damage Inventory was submitted to PDMG for further processing. The Primary Inspector had authority to

assign a Damage Inventory to an inspector of his choice or keep it to himself. DR-4473-PR Task Force had more than 60 persons, including 28 TACs, and the remainder were FEMA employees. The Task Force was subdivided into five crews, each led by a FEMA person titled Crew Leader.

16.     Plaintiff's first-line supervisors were Joseph Citriniti, a white male, and Maria J. Gonzalez, a female. Plaintiff's second-line supervisor was William Guzmán Colón. Mr. Citriniti, Ms. Gonzalez, and Mr. Guzmán Colón were Plaintiff's supervisors during the alleged discrimination period of April 2021. Site Inspector-Crew Lead Oscar Ramos Rodriguez was Plaintiff's inspection team leader and distributed Work Orders to contract employees. Mr. Rodriguez was a FEMA employee. Later in the mobilization, Mr. Rodriguez was replaced by Ms. Gonzalez as Crew Lead. Ms. Gonzalez was a FEMA employee. Ms. Gonzalez kept daily accountability of her team and tracked contractor work assignments. Task Force Lead Mr. Guzmán Colón was a FEMA employee. Mr. Guzmán Colón required weekly reporting of hours worked by contractors.

17.     Mr. Citriniti was a Program Analyst, GS-13 with FEMA and had been employed with FEMA since 2017 and had held his position as a Program Analyst since March 2021. While deployed to DR-4473-PR, Mr. Citriniti was the Task Force Leader.  Plaintiff, as well as approximately 30 other TACs, worked as site inspectors conducting damaged facility assessments under supervisors who then reported to him as the Task Force Leader.

18.     Mr. Citriniti was aware of Plaintiff's race and national origin because when Plaintiff arrived at the disaster, Plaintiff informed him and other staff that he was from Egypt. Mr. Citriniti was aware of Plaintiff's color through visual observation. Mr. Citriniti learned of Plaintiff's EEO activity when an alternative dispute resolution officer from DR-4473-PR called him to inform him that Plaintiff had reported that he was not being treated well at work and was not being respected or appreciated.

19.     Ms. Gonzalez was a Program Delivery Manager, Reservist, 01 and had been employed by FEMA for over four years leading up to 2021. During the alleged discrimination period of April 2021, Ms. Gonzalez's first-line supervisor was Mr. Guzmán Colón and her second-line supervisor was Mr. Citriniti. Ms. Gonzalez stated that she was assigned as Plaintiff's crew lead in DR-4473-PR. Ms. Gonzalez stated that she was aware of Plaintiff's race because they teleworked and she saw him on camera.

20.     Ellie Muhr was the operations manager for Flux Resources, LLC. Ms. Muhr was aware of Plaintiff's race based on a voluntary EEO form he completed at hire. Ms. Muhr was aware of Plaintiff's color based on the verification of his government identification for his I-9 form at hire.

21.     Jorge A. Cordero Malave was employed with FEMA as a Hazardous Mitigation Specialist, GS-9. Mr. Cordero Malave was Plaintiff's coworker and was aware of Plaintiff's race and color because they worked together in the field.

22.     FEMA Management was aware of Plaintiff's race, color, and national origin through visual observation when he met management personally or on MS Teams video conference. Mr. Citriniti knew Plaintiff personally. Plaintiff practiced his religion while deployed, including daily prayer. Plaintiff had not filed a formal EEO complaint before the subject complaint, but had reported unfairness and biased treatment. Plaintiff believed he was harassed because he reported his concerns.

23.     During his employment, Plaintiff was passed over in workload placement. Plaintiff identified Mr. Citriniti, Ms. Gonzalez, and Mr. Guzmán Colón as the individuals who subjected him to discrimination on the bases of race, color, national origin, religion, and reprisal.

24.     The Pilot Program crew was led by Mr. Guzmán Colón. Gary Arthurs, a white American born male, and Plaintiff were part of the Pilot Program crew. Plaintiff and Mr. Arthurs joined the

task at the same exact time and attended CCPRS orientation procedures together. Mr. Arthurs was a white American with an electrical engineering degree and practice. Mr. Citriniti placed Mr. Arthurs as Primary Inspector on most of the work orders that Plaintiff and Mr. Arthurs inspected together.

25.    Mr. Arthurs' engineering background did not possess knowledge of how to evaluate structural integrity of a building or distinguish between damages induced by seismic forces versus other causes such as shrinkage or settlement. Plaintiff shared his knowledge with Mr. Arthurs and taught him the basics of structural field inspection. In many cases, Plaintiff identified the damages and told Mr. Arthurs what to write in the Site Inspection Report. Mr. Arthurs relied heavily on emails regardless of the importance of the subject or his role with that subject.

26.    Plaintiff decided to be supportive of FEMA's mission without paying too much attention to why he was not placed as Primary Inspector as often as Mr. Arthurs. Plaintiff hoped his performance would lead the Task Force Leader to assign him as Primary Inspector more often. Plaintiff developed tutorial videos on how to create photo sheets and maps. The tutorials were distributed to everyone by the Task Force Leader because of their value in helping areas that needed improvement to minimize file sizes.

27.    On September 1, 2020, Mr. Arthurs sent an email confirming a site inspection for Work Order 62919, Government Center and Police Headquarters in San German. The September 1, 2020 email was sent to Yareli Dominguez Ortiz and Jennifer Toledo Rivera, and copied Javier Cortes Soto, Tiru Ruiz Ramon Luis, Mr. Citriniti Alvarado, Mr. Elgammal, Mr. Guzmán Colón, Christopher Cejka, and Mr. Rodriguez.

28.    On September 8, 2020, Mr. Arthurs sent an email to Plaintiff asking him to comment on a technical description for the cause of damage. The technical description was "Ground movement

due to earthquake-induced seismic forces." On September 9, 2020, Mr. Arthurs sent an email to Christopher Cejka, Mr. Guzmán Colón, Plaintiff, and Mr. Rodriguez regarding the Progress Report SI Pilot Program.

29. On September 11, 2020, Mr. Arthurs sent an email to Christopher Cejka and Plaintiff, copying Mr. Guzmán Colón, regarding organizing and assigning roles for inspections scheduled for September 14 through September 16. For Monday, September 14, regarding Work Order 62833, the email listed SIR as Chris, photos as Salah, and assist as Gary. For Tuesday, September 15, regarding Work Order 61888, the email listed SIR as Salah, photos as Gary, and assist as Chris. For Wednesday, September 16, regarding Work Order 63023, the email listed SIR as Gary, photos as Chris, and assist as Salah.

30. On September 16, 2020, Plaintiff emailed Mr. Guzmán Colón, Mr. Rodriguez, and Mr. Arthurs regarding photo pages for Work Order 62837, Damage Inventory 374857. The photo pages for Work Order 62837, Damage Inventory 374857, template and final printed PDF had been uploaded to the shared folder. On September 17, 2020, Mr. Arthurs emailed Plaintiff and stated that he believed Plaintiff, Chris, and Gary were not responsible for photo pages within the Pilot Program. Mr. Arthurs also stated, "Again, you are doing great work and I have been amazed at how fast you have acclimated to the FEMA process."

31. On September 19, 2020, Mr. Guzmán Colón emailed Mr. Arthurs, Christopher Cejka, and Plaintiff, copying Mr. Rodriguez, regarding SIR sketches. Mr. Guzmán Colón stated that all SIRs required a sketch. On October 9, 2020, Mr. Arthurs emailed Plaintiff, copying Mr. Guzmán Colón and Mr. Rodriguez, regarding DR-4473-PR Work Order 63257 and an October 13 site inspection with PRIDCO. Mr. Arthurs stated that Plaintiff was assigned as the Primary Inspector and that Gary would prepare to take photos and support Plaintiff however needed.

32.     February 3, 2021 to February 23, 2021 was the most aggravating and hostile work environment Plaintiff encountered while at his lowest level of confidence and psychological stability with nonstop anguish. This began with the removal of his name from previously scheduled inspections, with no courtesy call or professional or human contact asking about his wellbeing prior to the removal. FEMA, according to CCPRS, had requested a medical statement certifying his ability to perform the job. Plaintiff submitted two separate letters from two different medical professionals stating his ability to perform his job with no restriction. Contrary to any reasonable expectation, Mr. Citriniti removed Plaintiff from three consecutive projects and Plaintiff had no work assigned to him.

33.     Plaintiff reported the lack of workload to Mr. Terrada. Plaintiff also notified Mr. Terrada that he had been subject to a hostile work environment for personality issues aggravated by Mr. Terrada following his call. When Plaintiff did not do something the way Mr. Citriniti ordered him to, he became subject to retaliation. Plaintiff had an episode of bleeding and, after this episode, was stripped from all projects except one, the Colegio Ponceno project. Plaintiff informed Mr. Terrada of CCPRS, who suggested that he contact the Crew Lead. Plaintiff requested that Mr. Guzmán Colón and Mr. Citriniti revise his inspection workload.

34.     On April 9, 2021, Ms. Gonzalez emailed Plaintiff, copying Victor Sierra Garcia, regarding Work Order 68238. In the April 9, 2021 email, Ms. Gonzalez stated, "Good Afternoon Salah Regarding the above WO Visited on 4-6-2021 you were the primary SI, team is waiting for SIR's to be uploaded to begin Working on these three DIs assigned to the pilot data entry. Would you please advise when this will be uploaded."

35.     On April 15, 2021, Crew Lead Assistance Ms. Gonzalez sent Plaintiff a message stating that she had to know where her men were at all times. On April 15, 2021, at the end of a very long

9

exhausting inspection day for Ponce Prison facility, Plaintiff reviewed SMS messages and found that Ms. Gonzalez had sent him an SMS stating, "I have to know where my men are all the time." Plaintiff considered the implication of the phrase by imagining if he was the male lead with a female crew member and said, "I have to know where my women are all the time." Plaintiff realized he had been disrespected and harassed by Ms. Gonzalez's statement.

36.    Plaintiff requested clarification from Ms. Gonzalez regarding what she meant by "my men." Instead of retracting her message, Ms. Gonzalez made him more confused. Plaintiff asked Ms. Gonzalez not to waste whatever little energy he preserved for a safe drive home. Ms. Gonzalez's response was hostile and threatening, replying, "You are being disrespectful, and I will not tolerate that."

37.    This occurred at the end of a day with other stressful elements due to security, safety, and health protocols associated with the inspection. Plaintiff performed all inspection duties while in full PPE. The inspection duties included identifying, dimensioning, writing, and taking photos of damages. Plaintiff was fasting due to Ramadan, which he observes as a Muslim. The facility was approximately 123,000 square feet, subdivided into seven buildings interconnected in an odd configuration with inmates present in some areas. The project included 120 damages recorded in 25 sheets, 450 photos taken, and more than 12 damage key plan sketches developed.

38.    On April 17, 2021, Ms. Gonzalez sent Plaintiff an email titled "Accountability." TACs were required to report their time in three different forms. On Wednesday of the current week, TACs submitted to the FEMA Crew Lead hours for the rest of the week following Wednesday, with hours to be predicted or even unknown pending workload assignment. On Friday, TACs submitted time for the past week to CCPRS, which was reported to the FEMA Task Leader. On Saturday, TACs submitted to the Crew Lead just overtime hours worked during the past week.

10

39.    Mr. Guzmán Colón reported concern to Mr. Terrada because Plaintiff had not reported expected overtime hours on Wednesday due to lack of work, but reported his overtime hours on Saturday. The reason for not reporting expected overtime was because Plaintiff received a rework order on Thursday after submitting his FEMA timesheet. His Crew Lead usually received the same email of rework notification. There was no reason for Mr. Guzmán Colón to raise any concern.

40.    On Saturday, April 17, 2021, at 11:35 a.m., Ms. Gonzalez sent Plaintiff an email that he believed was a continued case of workplace harassment. Ms. Gonzalez asked Plaintiff for the project number he was working on and how many overtime hours he had worked on Saturday. The email communication was entitled "Accountability." Ms. Gonzalez already had the Damage Inventory number on Plaintiff's FEMA Time Sheet DILO/DILO, which she had received the previous Wednesday. Overtime was usually reported either late Saturday or Sunday. According to Mr. Guzmán Colón's email, Saturday overtime hours were to be reported on Monday.

41.    The April 17, 2021 email from Ms. Gonzalez to Plaintiff copied Palmira Torres Mercado and Mr. Guzmán Colón. In the April 17, 2021 email, Ms. Gonzalez wrote: "Good Morning Salah Hope this email finds you well, I called you this morning since I didn't find you I wanted to know what DI you were working on. Please let me know and send me the total OT when you can. Thank you and have a great weekend."

42.    On April 20, 2021, at approximately 6:26 a.m., Ms. Gonzalez emailed Plaintiff regarding "DI-371052 - Ponce las Cucharas 500 Correctional Complex." The April 20, 2021 email was sent by Ms. Gonzalez to Plaintiff and copied Mr. Guzmán Colón, Lymarie Rivera Ortiz, Palmira Torres Mercado, Elliot Mercado Negron, Jaime Lopez-Hernandez, Douglas Holmberg, and Alberto Quinones Caraballo. Ms. Gonzalez asked Plaintiff to upload all information into the common drive that day so that Alberto Quinones Caraballo could complete inspection data entry.

11

43.     On April 20, 2021, at approximately 6:35 a.m., Plaintiff received an email from Ms. Gonzalez asking him to turn over all documents he had on the Ponce Prison inspection project to the shared drive because someone else would be conducting the DDD in GM29. Because the project was not a pilot project and Plaintiff was not even the Primary Inspector, he was singled out by the request. Based on the list of names addressed in Ms. Gonzalez's email, it was a clear indication that this was a pileup of a paper trail.

44.     On April 20, 2021, at approximately 10:00 a.m., Plaintiff received a call from Mr. Terrada asking him to shut down FEMA equipment and not contact FEMA personnel because FEMA had decided to demobilize him. By approximately 4:00 p.m., Plaintiff received another call from Mr. Terrada telling him that the FEMA individual who said Plaintiff would be demobilized was rushing himself out and that FEMA was still looking into the subject.

45.     Ms. Muhr stated that on April 20, 2021, Flux Resources was notified that FEMA wanted to demobilize Plaintiff based on the recent incident of him allegedly not following protocol. Ms. Muhr stated that Flux Resources was informed by CCPRS that Plaintiff had failed to follow COVID protocols to enter a correctional facility site where he was performing inspections. Ms. Muhr stated that she understood a negative COVID test was required within 72 hours of entering the site and, according to CCPRS, this protocol was not followed by Plaintiff. Ms. Muhr stated that Flux Resources was informed by CCPRS that this ultimately caused FEMA operations on that site to be temporarily shut down.

46.     On April 21, 2021, Plaintiff received a call from Tony Terrada telling him that FEMA had decided he would be demobilized or terminated. This was a direct result of Plaintiff reporting unfairness and biased treatment to HR and higher-ups.

47.     Mr. Citriniti stated that if Plaintiff was terminated from FEMA, Plaintiff's TAC management CCPRS team would have specific details of the termination. Mr. Citriniti stated that Plaintiff's behavior and performance identified by the TAC trainer and TAC management was poor and late. Mr. Citriniti stated that Plaintiff was arriving uninvited to sites when not scheduled. Mr. Citriniti stated that Plaintiff was not meeting performance standards. Mr. Citriniti stated that Plaintiff was also being perceived as disrespectful to others and not following work-related instructions for completing tasks. Mr. Citriniti stated that he did not make the decision to terminate Plaintiff from FEMA.

48.     On April 23, 2021, Plaintiff's employment as a contractor with Flux Resources for FEMA deployment DR-4473-PR Branch IV in Ponce, Puerto Rico was terminated. FEMA demobilized Plaintiff on or about April 23, 2021. FEMA notified Plaintiff of demobilization by an email from the FEMA Deployment Tracking System. Plaintiff's demobilization did not terminate his contract with Flux Resources. Plaintiff was a subcontractor with FEMA for approximately eight months before demobilization.

49.     On June 2, 2021, Plaintiff sought EEO counseling concerning allegations of discrimination, retaliation, and harassment. EEO counseling concluded on October 21, 2021. On November 4, 2021, Plaintiff filed a formal EEO complaint. The formal EEO complaint alleged discrimination based on race, color, religion, national origin, and retaliation. The formal EEO complaint also alleged hostile work environment and wrongful termination after reporting unfairness and biased treatment. The formal complaint identified the Agency Case Number as HS-FEMA-01432-2021.

50.     The Agency's Letter of Acceptance was dated May 12, 2022. The accepted issues included whether Plaintiff was discriminated against and subjected to harassment based on race, color, religion, national origin, and reprisal when, on dates not specified while deployed on DR-4473-

PR, Plaintiff became a subject of retaliation with excessive hostility in the work environment leading to his alleged wrongful termination because he reported unfairness and biased treatment to HR and higher-ups. The accepted issues included whether Plaintiff was passed over in workload placement while deployed on DR-4473-PR. The accepted issues included whether, on April 15, 2021, Crew Lead Assistance Ms. Gonzalez sent Plaintiff a harassing message that "she has to know where her men are at all times." The accepted issues included whether, on April 17, 2021, Ms. Gonzalez sent Plaintiff an email titled "Accountability" and requested information from him. The accepted issues included whether, on April 23, 2021, Plaintiff's employment as a contractor with Flux Resources for FEMA deployment DR-4473-PR Branch IV in Ponce, Puerto Rico was terminated.

51.     The investigation was conducted by Consuelo D. Reed of HR Anew. The investigation was conducted in Washington, D.C. The method of investigation was telephonic interviews and written affidavits. The dates of investigation were June 2022 through July 2022.

52.     After the Agency's investigation, Plaintiff requested a hearing before an EEOC Administrative Judge. A hearing was conducted on November 18, 2024. The Agency argued that the EEOC lacked jurisdiction because Plaintiff was not an applicant or employee under federal-sector EEO law. On December 11, 2024, the EEOC Administrative Judge dismissed the complaint for lack of jurisdiction, finding that Plaintiff was an independent contractor and that FEMA was not his joint employer.

## COUNT I

**Race, Color, and Sex Discrimination in Violation of Title VII**

**42 U.S.C. § 2000e-16(a)**

53.   Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

54.   Plaintiff is a Black male and was perceived and treated by FEMA management and personnel as a member of protected race and color classes under Title VII.

55.   At all relevant times, FEMA was a joint employer of Plaintiff and exercised sufficient control over Plaintiff's daily work assignments, schedule, accountability reporting, equipment, mobilization, demobilization, and other material aspects of his FEMA assignment to qualify as Plaintiff's employer or joint employer for purposes of Title VII.

56.   Defendant, through FEMA managers, supervisors, and employees, subjected Plaintiff to less favorable terms, conditions, and privileges of employment because of his race, color, and sex.

57.   Defendant's discriminatory conduct included, but was not limited to, passing Plaintiff over for workload placement, assigning more favorable workload opportunities to similarly situated personnel outside Plaintiff's protected classes, subjecting Plaintiff to heightened scrutiny and accountability demands, and treating Plaintiff as less trustworthy or less entitled to work opportunities than similarly situated personnel outside his protected classes.   Plaintiff was threatened by a female supervisor at FEMA and was told his comments would not be tolerated when he responded to discriminatory comments by the female supervisor.

58.   Defendant's discriminatory conduct adversely affected Plaintiff's work assignments, deployment, workload placement, ability to perform FEMA disaster assistance work, and continued assignment to the FEMA project.

59.   Defendant's discriminatory conduct culminated in Plaintiff's demobilization from the FEMA assignment on or about April 23, 2021 and termination from employment.

60.    Defendant's race- and color-based discrimination caused Plaintiff to suffer damages, including lost income and benefits, emotional distress, inconvenience, reputational harm, and other compensable losses.

## COUNT II

### National Origin Discrimination in Violation of Title VII

### 42 U.S.C. § 2000e-16(a)

61.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

62.    Plaintiff is of Egyptian/Arab national origin and is protected from discrimination based on national origin under Title VII.

63.    Defendant, through FEMA managers, supervisors, and employees, discriminated against Plaintiff because of his Egyptian/Arab national origin.

64.    Defendant subjected Plaintiff to disparate treatment, heightened scrutiny, unfair work-allocation practices, and other materially adverse treatment in the terms, conditions, and privileges of his FEMA assignment.

65.    FEMA's control over Plaintiff's assignments, deployment, work-order placement, accountability tracking, and demobilization made Defendant responsible for the discriminatory acts and omissions alleged herein.

66.    Defendant's national-origin discrimination altered Plaintiff's work environment, interfered with his ability to perform his duties, and culminated in the termination or demobilization of Plaintiff from the FEMA assignment and termination from employment.

67.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff suffered damages, including lost income and benefits, emotional distress, inconvenience, reputational harm, and other compensable losses.

## COUNT III

### Religious Discrimination in Violation of Title VII

### 42 U.S.C. § 2000e-16(a)

68.     Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

69.     Plaintiff is Muslim and is a member of a protected religious class under Title VII.

70.     Defendant, through FEMA managers, supervisors, and employees, discriminated against Plaintiff because of his religion.

71.     Defendant subjected Plaintiff to less favorable treatment, heightened scrutiny, and unequal work-related requirements and expectations compared to similarly situated personnel outside his protected class.

72.     Defendant's discriminatory treatment affected Plaintiff's work assignments, accountability requirements, workload placement opportunities, and continued assignment to FEMA disaster assistance work.

73.     Defendant's religious discrimination was intentional, unlawful, and a motivating factor in the adverse treatment Plaintiff experienced, including the hostile work environment and his demobilization from the FEMA assignment.

74.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff suffered damages, including lost income and benefits, emotional distress, inconvenience, reputational harm, and other compensable losses.

## COUNT IV

### Hostile Work Environment in Violation of Title VII

### 42 U.S.C. § 2000e-16(a)

75.     Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

76.     Plaintiff was subjected to unwelcome harassment and discriminatory conduct based on race, color, religion, national origin, and/or protected EEO activity.

77.     The hostile work environment included, but was not limited to, being passed over for workload placement, being subjected to heightened scrutiny and accountability demands, being subjected to an April 15, 2021 message by FEMA Crew Lead Ms. Gonzalez stating that she had to know where her men were at all times, being subjected to an April 17, 2021 "Accountability" email and related scrutiny, and being treated as less trustworthy or less entitled to work opportunities than similarly situated personnel outside Plaintiff's protected classes.

78.     The hostile work environment also included the removal of Plaintiff from work assignments, the alleged denial of workload placement, the requirement that Plaintiff provide medical documentation certifying his ability to perform the job, and the use of accountability and reporting requirements in a manner that Plaintiff reasonably perceived as hostile and discriminatory.

79.     The conduct was sufficiently severe or pervasive to alter the terms, conditions, and privileges of Plaintiff's FEMA assignment.

80.     The conduct unreasonably interfered with Plaintiff's ability to perform his work as a Senior Structural Engineer.

81.    Defendant knew or should have known of the discriminatory and retaliatory hostility and failed to take prompt, effective remedial action.

82.    Instead, the hostile work environment culminated in Plaintiff's demobilization from the FEMA assignment on or about April 23, 2021.

83.    As a direct and proximate result of Defendant's hostile work environment, Plaintiff suffered damages, including lost income and benefits, emotional distress, inconvenience, reputational harm, and other compensable losses.

## COUNT V

### Retaliation in Violation of Title VII

### 42 U.S.C. § 2000e-16(a)

84.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

85.    Title VII's federal-sector provisions prohibit retaliation against an employee or applicant because the person opposed unlawful employment practices or participated in protected EEO activity.

86.    Plaintiff engaged in protected activity by opposing unfair, biased, discriminatory, and/or retaliatory treatment.

87.    Plaintiff reported unfairness and biased treatment to HR at FEMA.

88.    Defendant, through FEMA, subjected Plaintiff to materially adverse actions after he engaged in protected activity.

89.    The materially adverse actions included, but were not limited to, heightened scrutiny, hostile treatment, removal from work assignments, denial of workload placement, accountability-related scrutiny, and demobilization from his FEMA assignment and termination from employment.

90. Defendant's retaliatory conduct would dissuade a reasonable worker from making or supporting a charge of discrimination.

91. Defendant's conduct violated Title VII, including 42 U.S.C. § 2000e-16(a).

92. As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff suffered damages, including lost income and benefits, emotional distress, inconvenience, reputational harm, and other compensable losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor and against Defendant and award the following relief:

A. Declare that Defendant violated Plaintiff's rights under Title VII of the Civil Rights Act of 1964, as amended;

B. Award Plaintiff back pay, lost wages, lost benefits, and other equitable make-whole relief available by law;

C. Award Plaintiff front pay or other prospective equitable relief, as appropriate;

D. Award Plaintiff compensatory damages for emotional distress, inconvenience, reputational harm, and other compensable losses in an amount to be determined by the jury or the Court;

E. Award Plaintiff pre-judgment and post-judgment interest to the fullest extent permitted by law;

F. Award Plaintiff reasonable attorneys' fees, litigation expenses, and costs pursuant to Title VII and other applicable law;

G. Award such injunctive and equitable relief as the Court deems just and proper; and

H.      Award such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMAND**

Plaintiff demands a jury trial on all claims against Defendant.


Date: June 16, 2026                          Respectfully submitted,


                                        _____/s/ *David A. Branch*_____
                                        David A. Branch, D.C. Bar No. 438764
                                        Law Office of David A. Branch &
                                        Associates, PLLC
                                        1120 Connecticut Avenue, NW, Suite 500
                                        Washington, D.C. 20036
                                        Phone: (202) 785-2805
                                        Email: davidbranch@dbranchlaw.com

21